E-FILED
Friday, 09 June, 2006  02:41:20 PM
Clerk, U.S. District Court, ILCD

# United States District Court

CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA

v.

TODD BLACK

**FILED**

JUN - 9 2006

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**CRIMINAL COMPLAINT**

CASE NUMBER: 06-6029

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about December 2003, to in or about June 2004, in Knox county, in the Central District of Illinois and elsewhere, the defendant, (Track Statutory Language of Offense)

TODD BLACK, did knowingly conspire to commit the offense of wire fraud

(SEE ATTACHMENT A)

in violation of Title 18 United States Code, Section(s) 371

I further state that I am a Special Agent, FBI and that this Complaint is based on the following facts:

(SEE ATTACHMENT B)

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

s/ Agent
Signature of Complainant
Paul Fairbanks
Special Agent, FBI

Sworn to before me and subscribed in my presence,

June 9, 2006 at Peoria, IL
Date                                                         City and State

JOHN A. GORMAN
United States Magistrate Judge                               s/John A. Gorman
Name & Title of Judicial Officer                             Signature of Judicial Officer

ATTACHMENT A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| TODD BLACK, ) | VIO: 18 U.S.C. §371 |
| ) | |
| Defendant ) | |

**CRIMINAL COMPLAINT**
(Conspiracy to Commit Wire Fraud)

A.  Background

1. In 2003, Todd Black and J.G. formed Galesburg Motors, Inc. Black was the President. The purpose of the corporation was to purchase, own and run car dealerships. Eventually the corporation owned three dealerships -Black Pontiac in Galesburg, Black Auto Center in Galva and Black Chevrolet in Cambridge, Illinois.

2. In March of 2003, Black contracted with General Motors Acceptance Corporation (hereinafter GMAC) to provide financing for new and used vehicles. This arrangement is commonly called a floor plan.

3. Under the terms of the floor plan, GMAC would finance 75% of the book value of a vehicle when Black purchased the vehicle. For new vehicles, after the vehicle was assembled and shipped, General Motors would bill GMAC by wire and the vehicle

1

would be placed on Black's floor plan. GMAC would pay General Motors for the cost of the vehicle through a wire transfer of funds taking place in Detroit, Michigan.

4. For used vehicles, after Black agreed to purchase a vehicle from a seller he would fax, by wire, a floor plan request and the front of the title to GMAC in Chicago. GMAC would then send a request for transfer of funds to Smart Cash in Detroit, Michigan by wire and Smart Cash would send the request to Harris Bank in Orland Park, Illinois by wire. Harris Bank would then send money to Black's account by wire.

5. The Smart Cash servers that run the Smart Cash website and connect to Harris Bank to initiate all of the money transfers were located in Plano, Texas and Raleigh, North Carolina.

6. Black signed a Wholesale Security Agreement with GMAC. The Wholesale Security Agreement required Black to pay GMAC for a vehicle within two days of the sale of the vehicle. After Black sold a new car he would notify Smart Cash in Detroit, by fax, and Smart Cash would notify Harris Bank in Orland Park to withdraw money from Black's account. After Black sold a used car, he would send a Wholesale Payoff Request by fax to Smart Cash and Smart Cash would contact Harris Bank to withdraw the money from Black's account.

7. GMAC conducted periodic audits at Black's dealerships to insure that the cars financed on the floor plan were on the car lots. When Black could not produce a missing vehicle or provide a good explanation for where the vehicle was, he had to write a check to GMAC to pay for the vehicle.

B.    <u>The Scheme</u>

8. From in or about December 2003, until in or about June 2004, in Knox County within the Central District of Illinois and elsewhere, the defendant, Todd Black, knowingly devised and intended to devise a scheme to defraud GMAC.

9. Instead of paying GMAC after a vehicle was sold, the defendant concealed and directed others to conceal the sales from GMAC by failing to report them to GMAC.

10. When GMAC auditors discovered that the vehicle was not on the car lot, the defendant would create and direct others to create false "deal jackets" showing that the vehicle had just been sold within the last two days, when in fact it had been sold before that.

11. The defendant would also make false and fraudulent claims regarding the whereabouts of vehicles to the GMAC auditors and direct others to do the same. For example, the defendant and others at his direction would claim that some vehicles were in transit, when in fact they had already been sold and they would claim that vehicles had been loaned to customers as "demos" when in fact they had been sold.

12. In addition to falsifying the whereabouts and sale dates of cars sold by the defendants, the defendant also obtained copies of the front page of titles from cars owned by B.F. in Wentzville, Missouri by fax and submitted the front pages along with request for floor planning by fax to GMAC. The defendant never had or owned or purchased the vehicles, but instead represented to GMAC that in fact he did.

13. When GMAC questioned Black and his employees about the missing cars,

3

Black provided several explanations for their whereabouts. He also faxed GMAC a list of cars he claimed were being transported to his dealership. That was false. B.F. also faxed a list of cars from his dealership in Wentzville, Missouri to GMAC in Illinois which he claimed belonged to Todd Black and were on B.F.'s car lot. That was false.

14. To prevent GMAC from discovering that the defendant had converted the proceeds from the sale of the floor-planned vehicles, the defendant used the proceeds from subsequent sales of vehicles to pay GMAC for vehicles he had previously converted and sold.

15. In an effort to lull GMAC into believing that defendant Black would pay back the money he owed GMAC, he presented GMAC checks totaling over 1.2 million dollars. The checks were not good because there were insufficient funds in Black's bank account to cover the checks.

16. Defendant Todd Black used over $275,000 from the proceeds from the sale of vehicles to pay personal expenses, including payments for repairs and remodeling on his home and condo, payments on personal loans, cash to himself and his wife, payments on his personal credit card, payments to a local country club, loans to personal friends, his boat payments, his boat slip rental, and jet skis.

C.    The Conspiracy and Overt Acts

17. From in or about December 2003, and continuing until in or about June 2004, in Knox County within the Central District of Illinois, and elsewhere, the defendant,

TODD BLACK,

4

knowingly and wilfully conspired and agreed with other persons to commit the offense of wire fraud, in violation of Title 18, United States Code, Section 1344, in that he did knowingly devise and execute and attempt to execute a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations and for the purpose of executing such scheme and artifice caused interstate wire communications to take place.

## OVERT ACTS

18. In furtherance of the conspiracy, the defendant and other co-conspirators committed numerous overt acts, in furtherance of the scheme and conspiracy.

    a. Todd Black directed other co-conspirators to prepare false deal jackets and provided and directed others to provide false information to GMAC. He caused certain paperwork to be faxed and e-mailed from Galesburg, Illinois to Chicago, Illinois and to Plano, Texas and he also caused certain paperwork to be faxed from Missouri to Illinois.

19. G.P. created false deal jackets showing the recent sale of cars that Black either never owned or that he had sold some time before.

20. J.K. created false deal jackets showing the recent sale of cars that Black either never owned or that he had sold some time before.

21. M.S. falsified financial statements to GMAC regarding the dealership's profits and changed the dates of car sales in deal jackets to make them appear to be recent sales.

22. B.S. faxed fraudulent titles for the ghost cars to GMAC and Schultz changed the dates on deal jackets to make them appear to be recent sales.

23. J.B. changed dates on deal jackets to make them appear to be recent sales.

24. W.K. directed others to change the dates on deal jackets to make them appear to be recent sales

25. B.F. provided the front pages of car titles to Black so Black could floor plan cars he never owned and lied to GMAC personnel when they called to verify the location of the cars.

All in violation of Title 18, United States Code, Section 371.

ATTACHMENT B
AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND
ARREST WARRANT

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for approximately 3 months. I am currently assigned to the Springfield Division, Peoria Resident Agency, to a squad responsible for general criminal investigations. Prior to being hired by the Federal Bureau of Investigation, I worked as a paralegal for the United States Attorney's Office for the Southern District of Illinois for eight and one half years. I was responsible for monitoring civil fraud investigations in that position. As a result of my experience in criminal and civil fraud investigations, I am familiar with fraud in the private and public sectors.

2. This affidavit is submitted in support of an application for a complaint and arrest warrant charging TODD BLACK (BLACK) with wire fraud, in violation of 18 U.S.C. § 1343.

3. Information in this affidavit is based on my personal knowledge and on information provided to me by other special agents and FBI employees during the course of this investigation. The information contained in this affidavit is sufficient to establish probable cause to believe that BLACK committed the offense of mail fraud. It does not include all information that has been gathered during the course of this investigation, but merely includes an amount of evidence sufficient to support a finding of probable cause.

I. Background

4. BLACK was director and president of GALESBURG MOTORS, INC., an Illinois Corporation. GALESBURG MOTORS, INC., owned several car dealerships in the Galesburg, Illinois, area. Two of those businesses are relevant to this complaint: BLACK PONTIAC, located in Galesburg, and BLACK CHEVROLET, located in Galva, Illinois. According to

employees of those businesses, BLACK exercised total control over those businesses.

5.   According to S.T., Operations Manager, General Motors Acceptance Corporation ("GMAC"), BLACK's businesses were financed by GMAC financing. GMAC financed BLACK's businesses by providing them with what was termed a "floor plan." In BLACK's case, this meant that GMAC financed 100 new vehicles and 60 used vehicles at his Galesburg, Illinois location. BLACK also had a credit line of 75 new vehicles, and 30 used vehicles at his Galva, Illinois location. GMAC financed 75% of book value. BLACK was charged the prime interest rate plus a half percent for the loans. When BLACK ordered new vehicles, General Motors (GM) would coordinate with GMAC to finance the vehicles when they were shipped. When BLACK wanted to purchase a used vehicle, he had to fax a request to have the vehicle added to his floor plan and a copy of the front of the title.

One document involved in this process is referred to as a "deal jacket." When BLACK acquired a vehicle using GMAC credit, BLACK was required to prepare a "deal jacket." By submitting a "deal jacket," BLACK actually obtained funds in an amount equal to 75% of the cost of the vehicle. The deal jacket contained pertinent information regarding the vehicle which was being financed by GMAC. If BLACK's business sold a GMAC-financed vehicle, BLACK was required to notify GMAC by submitting the deal jacket.

GMAC would conduct an audit at both of BLACK's dealerships every month to check the vehicles and to verify the collateral. BLACK had signed a Wholesale Security Agreement with GMAC, where he agreed to pay back GMAC within two days when he sold a vehicle. If during an audit BLACK did not have a vehicle on his car lot or a good explanation as to where the vehicle was, BLACK had to write a check to pay GMAC for the vehicle.

6.   BLACK PONTIAC and BLACK CHEVROLET submitted requests for payment

to GMAC using two different methods. BLACK CHEVROLET submitted payment requests through a GMAC method referred to as Smartcash 3.0. In that method, when BLACK CHEVROLET acquired a vehicle for its floor plan, a BLACK CHEVROLET employee faxed the appropriate documents to GMAC offices in Orland Park, Illinois. GMAC Employees in Orland Park verified certain information and approved the transaction. Employees of that office then entered the information from those documents into a GMAC computer system and sent them via a GMAC intranet to a GMAC office in Plano, Texas. That office created electronic files, sent them via the internet to Harris Bank in Illinois. Harris Bank then transmitted the files via the internet to the Federal Reserve Bank in Atlanta, Georgia. That bank transmitted a debit or credit to and automatic clearinghouse, which automatically either issued a payment to a BLACK CHEVROLET account, or automatically withdrew an appropriate amount from that account and deposited it in a GMAC account.

BLACK PONTIAC submitted payment requests through a GMAC method referred to as Smartcash 4.0. In that method, when BLACK CHEVROLET acquired a vehicle for its floor plan, a BLACK CHEVROLET entered information regarding the vehicle into a computer and transmitted it via the internet to a Smartcash facility in Raleigh, North Carolina. GMAC Employees in Orland Park verified certain information and approved the transaction. Employees of the Raleigh office then transmitted the appropriate information via a GMAC intranet to a GMAC office in Plano, Texas. That office created electronic files, sent them via the internet to Harris Bank in Illinois. Harris Bank then transmitted the files via the internet to the Federal Reserve Bank in Atlanta, Georgia. That bank transmitted a debit or credit to an automatic clearinghouse, which automatically either issued a payment to a BLACK CHEVROLET account, or automatically withdrew an appropriate amount from that account and deposited it in a GMAC

account.

## II. Schemes to Defraud

7. BLACK defrauded GMAC in two fashions. First, BLACK ordered employees not to notify GMAC of vehicle sales. By concealing the sale of vehicles, BLACK deprived GMAC of the proceeds of those sales.

8. M.S. provided the following information to agents of the Federal Bureau of Investigation: M.S. was office manager for BLACK PONTIAC in Galesburg, Illinois. During an audit by GMAC, BLACK ordered M.S. to change the sale dates on documents contained in "deal jackets." He ordered M.S. to change them to conceal the actual date on which the vehicle was sold. By concealing the actual date, BLACK concealed the fact that he had never informed GMAC of the sale or reimbursed it for the vehicle. BLACK also ordered M.S. to change dates in a computer to conceal the actual dates of sales.

9. J.K. provided the following information to agents of the Federal Bureau of Investigation: J.K. was a salesman with BLACK PONTIAC. During the July 2004 GMAC audit of BLACK's dealership, employee B.S. ordered J.K. to change sale dates in deal jackets. Business manager J.G. then gave J.K. a paper stating what dates to change and how to change them. J.K. changed the dates on various forms, including tax forms, odometer statements, and buyer's order forms for each sale with new dates. J.K. then called another BLACK PONTIAC employee, G.P.. G.P. told J.K. that BLACK had ordered employees to submit titles to GMAC for vehicles which BLACK PONTIAC had never acquired. BLACK ordered employees to do this in order to obtain money from GMAC.

J.K. did not come to work the day after the audit. Two days after the audit, J.G. told J.K. to destroy the redone files. B.S. found the files in August, and J.K. destroyed them

because he was concerned that he would lose his job.

10. J.G. provided the following information to agents of the Federal Bureau of Investigation: J.G. worked for BLACK PONTIAC. J.G. worked as sales manager. In December 2003, J.G. reviewed some titles on BLACK PONTIAC's "floor plan." J.G. thought something was wrong with the titles. He asked BLACK about it. BLACK told him not to worry about it. J.G. eventually realized that the vehicles did not exist, and notice further vehicles on the floor plan which did not exist.

When GMAC came to BLACK's dealerships to conduct an audit, G.P. would put a current date on the invoice to make it look like the vehicle was just sold. BLACK would then have to pay for these vehicles the next day.

J.G. knew that BLACK was receiving the fraudulent titles from B.F.'s car lot, because on top of the faxed titles was printed Fruendly Auto Sales.

11. B.S. provided the following information to agents of the Federal Bureau of Investigation: B.S. worked as business manager for BLACK CHEVROLET. In late 2003, B.S. noticed that two cars were listed on BLACK CHEVROLET's floor plan which were not on BLACK CHEVROLET's lot. B.S. noticed other vehicles that were on the dealership's car list, but not on the lot. In June 2004, B.S. noticed six missing vehicles. Most of the missing vehicles were registered at the Galva dealership. J.B. had a file with titles stapled to the inside if they had been entered on GMAC's floor plan. J.B. had other titles in that folder that had not been used. B.S. said that B.F.'s name was on some of the titles.

When B.S. moved to BLACK's Galesburg dealership, she was asked to do the GMAC "smart cash". B.S. would send titles to GMAC by fax to be put on BLACK's floor plan. She was also asked to pay off vehicles on the floor plan that had been sold. BLACK would give B.S. the

titles, and a request for the vehicles to be put on BLACK's floor plan. B.S. would fax the request to GMAC. B.S. knows that some of the titles she faxed to GMAC for the floor plan were fraudulent.

At every audit BLACK had vehicles that were sold, but he had not paid GMAC. In prior month's audits, BLACK just paid GMAC for the missing vehicles at the end of the audit.

When B.S. arrived at the Galesburg dealership, BLACK wanted B.S. to change the dates on car folders to reflect a recent sale on vehicles sold in the past. B.S. had J.K. help her change the dates of vehicles sales on these folders.

B.S. overheard BLACK talking with B.F. about some vehicles that B.F. was to tell K.NLU were located at his lot waiting to be taken to an auction. B.S. thinks these were vehicles on the GMAC floor plan with fraudulent titles.

During the GMAC audit, K.LNU saw the deal jackets and told J.G. that they could get in trouble for falsifying documents. J.G. told K. about the fraudulent deals, and gave her the real jackets. J.G. and K.LNU then went outside to talk.

12.   G.P. provided the following information to agents of the Federal Bureau of Investigation: G.P. was BLACK PONTIAC's Finance and Sales Manager. BLACK ordered G.P. to fax the front side of eight vehicle titles to GMAC. G.P. put the eight titles into separate jackets with blank tax forms, odometer statements, and purchase agreements. G.P. put these jackets into a file cabinet.

Within a month, GMAC came to BLACK's dealership to conduct an audit of the floor plan. BLACK told G.P. to pull the eight jackets, and enter made up names and dates of sales into the computer. G.P. printed the forms to make it appear that someone had just purchased the vehicles.

BLACK also had G.P. pull up old vehicle sales, and re-enter the date of the sale. G.P. reprinted the forms in the jackets with new dates. It would only take approximately five minutes to do each vehicle jacket. G.P. remembered that the vehicles had sold within the previous several weeks.

G.P. asked BLACK about the change in sales dates. BLACK told G.P. they needed to show that the vehicle had just sold, because it had not been paid off yet.

Sometime in the Spring 2004 during another GMAC audit, G.P. recalled redoing the dates, and paperwork on ten to twelve vehicles that had been sold.

### III. The July 2004 audit of BLACK PONTIAC and BLACK CHEVROLET

13.   C.M. provided the following information to agents of the Federal Bureau of Investigation: C.M. of GMAC conducted multiple audits of BLACK PONTIAC. In May 2004, she discovered numerous missing vehicles. J.G. had usually assisted her at prior audits, but when she asked him for assistance he instructed her to see BLACK. BLACK told C.M. that the missing vehicles were in St. Louis, Missouri.

C.M. returned to BLACK's dealership on June 17, 2004 for another audit. C.M. discovered sixteen cars were missing. BLACK told C.M. that he had taken vehicles to a St. Louis auction, and they did not sell, so they would be coming back to his dealership. C.M. knew something was wrong at the dealership, due to the missing vehicles for May and June 2004. C.M. contacted GMAC about the missing vehicles. GMAC contacted the St. Louis auction. The St. Louis auction told GMAC that BLACK did not have any vehicles there. C.M. received a supplemental audit from GMAC to verify all vehicles on GMAC's floor plan at BLACK's dealership within 25 days. C.M. stated that the other dealerships can always account for their vehicles. BLACK was also missing the titles for all the missing vehicles.

C.M. returned July 28, 2004 to do July's audit and the June Supplemental Audit. After C.M. counted the vehicles at BLACK's Galesburg and Galva, Illinois dealerships, she discovered 100 vehicles were missing. C.M. arrived at BLACK's Galesburg dealership at 6:30 a.m. BLACK was supposed to have 178 vehicles on his Galesburg lot. C.M. counted 120 vehicles on BLACK's lot, but twenty were pre 1998 vehicles that were not on GMAC's floor plan. C.M. then went to BLACK's Galva dealership to check on the 37 vehicles that were suppose to be on the lot.

C.M. found five vehicles on BLACK's Galva dealership lot. At approximately 7:30 a.m., B.S., an employee of BLACKs, arrived at the Galva dealership. B.S. did not know the location of any of the missing vehicles. B.S. stated that some of the vehicles could be at BLACK's new dealership in Cambridge, Illinois. C.M. gave B.S. a list of the missing 137 vehicles. C.M. went to Cambridge and B.S. went to Galesburg. C.M. found ten of the missing new cars at BLACK's Cambridge dealership. C.M. returned to BLACK's Galesburg dealership.

At the Galesburg dealership, C.M. wanted to check on the titles of the missing vehicles. C.M. went to the business office counter. J.G. started to bring C.M. "Deal Jackets" for the missing vehicles. C.M. did not ask J.G. for the "Deal Jackets". While C.M. was standing at the business office counter, she noticed the printer in the Finance and Insurance Office was always going. J.G. continued to bring C.M. "Deal Jackets" from the Finance and Insurance Office.

While C.M. was waiting for the titles, she picked up some of the "Deal Jackets". All of the "Deal Jackets" were exactly the same. The "Deal Jackets" were in brand new folders. All of the Bill of Sale documents were in sequence, each containing an odometer statement, a Title Application, and a Sales Tax Form. C.M. checked thirteen "Deal Jackets", and all the vehicles had been sold in the previous two days. C.M. noted that the following documents were not in the

"Deal Jackets", cash receipts, copy of the customer's driver's license, credit bureau check, lien holder verification of payoff, insurance information, trade-in title, or a customer statement. C.M. thought that the "Deal Jackets" were fake and photo copied the thirteen vehicles bill of sale. C.M. then asked J.G. if she were to call the customers from the "Deal jackets", would they verify the vehicle was sold in the last two days. J.G. then took the files to BLACK and they went outside.

C.M. called GMAC to report the missing vehicles and fake "Deal Jackets". C.M. was told to trace the proceeds from the sale of the vehicles. BLACK then came to C.M. and admitted that five "Deal Jackets" were reprinted because he had overlooked the payoff for these vehicles that were sold in June. J.G. later told C.M. more than five "Deal Jackets" had been reprinted.

C.M. asked for the real "Deal Jackets" to check the proceeds. J.G. gave C.M. approximately 45 "Deal Jackets" for vehicles sold out of trust. These out of trust vehicles had been sold by BLACK, but he had not paid GMAC after the sale. The next day, four or five individuals from GMAC came to BLACK's dealership and found real "Deal Jackets" with fake "Deal Jackets" inside.

BLACK told C.M. that he had fifteen vehicles at B.F.'s car lot in St. Louis. BLACK said that nine vehicles were on a transport on the way to Galesburg, and the other six vehicles were at F.'s car lot. C.M. called A.G. at GMAC to report on these fifteen vehicles. A.G. called B.F. about the six vehicles of BLACKs on his lot. B.F. faxed A.G. a list of the six vehicles he had of BLACKs on his lot. C.M. told BLACK she would wait for the transport to verify those nine vehicles. Approximately two hours later, BLACK told C.M. the transport broke down and would not be coming to Galesburg. C.M. asked BLACK where the transport broke down, so she could go verify the vehicles. BLACK could never determine where the transport broke down.

Around noon, C.M. found several fake "Deal Jackets." At 4:30 p.m., C.M. walked across the street to Arbys. J.G. went to Arbys to talk to C.M. J.G. would not admit to any wrongdoing, but he did say "Hypothetically BLACK could get titles from his friend and use the copies of titles to floor plan GMAC vehicles".

During the May 2004 audit, J.G. had told C.M. that J.G. admitted that fake "Deal Jackets" had been made. B.S. later admitted that BLACK was flooring vehicles that did not exist.

M.S. was the dealership's Office Manager. M.S. had worked at Heartland Chevrolet, which also was closed down by GMAC for vehicles that were out of trust. M.S. admitted to knowing that BLACK was flooring vehicles that did not exist.

14. C.M. and S.T. provided the following information to agents of the Federal Bureau of Investigation. Furthermore, they provided documents which demonstrated the truth of that information:

The BLACK dealerships obtained money from GMAC by submitting "deal jackets" to GMAC through either Smartcash 3.0 or Smartcash 4.0. As was described earlier, BLACK caused his employees to submit "deal jackets" to GMAC for vehicles which BLACK had not bought and which were not owned by BLACK or his dealerships.

15. BLACK CHEVROLET employees submitted "deal jackets" to GMAC for vehicles containing the following vehicle identification numbers, knowing that the vehicles had not been purchases by BLACK CHEVROLET: 1FTNX21F1XEC69458 (May 27, 2004); 1FTNX21F2YEb88700 (May 27, 2004); 1FTSW32F9X6D34441 (May 27, 2004); 1FTRX18L2YKA45478 (May 19, 2004); 1GHDM19W5YB115387 (May 19, 2004); 3GKFK16T7YG138965 (May 19, 2004). BLACK CHEVROLET employees submitted those

"deal jackets" to GMAC using Smartcash 3.0. BLACK CHEVROLET's Smartcash account was benefitted in the amount of $72,400.00 based on BLACK CHEVROLET's submission of those fraudulent "deal jackets."

16. On July 16, 2004, BLACK PONTIAC employees submitted "deal jackets" to GMAC for vehicles containing the following vehicle identification numbers, knowing that the vehicles had not been purchases by BLACK PONTIAC: 1FMSU41F0YEA97752; 1FMSU43F8YEB19011; 1FMZU84P5YZC51729; 1FTRF17W4XNC07025; 1GHDX02EX1D287355; 1GNDT13W18YK103463; 1GNFK16R1XJ486748; 3GNEC16T2YG132681; 3GNFK16R0XG256524. BLACK PONTIAC employees submitted those "deal jackets" to GMAC using Smartcash 4.0. BLACK PONTIAC's Smartcash account was benefitted in the amount of $89,617.50 based on BLACK PONTIAC's submission of those fraudulent "deal jackets."

IV. Conclusion

17. Based on the evidence described above, I believe probable cause exists that from at least on or about May 19, 2004, through on or about July 17, 2004, in the Central District of Illinois and elsewhere, TODD BLACK, devised a scheme or artifice to defraud GMAC by the trick of submitting fake "deal jackets" to GMAC, and that TODD BLACK caused his employees to submit such fake deal jackets to GMAC by wire transmission over interstate wires, all in violation of 18 U.S.C. § 1343, and that in violation of 18 U.S.C. § 371 they conspired and agreed

to violate 18 U.S.C. § 1343 and committed numerous overt acts in the Central District of Illinois in furtherance of that conspiracy.

s/ Agent
Paul J. Fairbanks
Special Agent
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED BEFORE ME THIS 9th DAY OF JUNE, 2006.

s/John A. Gorman
UNITED STATES MAGISTRATE JUDGE